No. 12-17681

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DAVID H. PICKUP, et al.,
*Plaintiffs-Appellants*,

v.

EDMUND G. BROWN, et al.,
*Defendants-Appellees*,

and

EQUALITY CALIFORNIA,
*Defendant-Intervenor-Appellee*.

---

On Appeal from the United States District Court
for the Eastern District of California
Case No. 12-CV-02497 (Honorable Kimberly J. Mueller)

---

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANTS-APPELLEES AND IN SUPPORT OF AFFIRMANCE OF THE JUDGMENT BELOW

---

Elizabeth O. Gill (SBN 218331)
Margaret C. Crosby (SBN 56812)
ACLU FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm St.
San Francisco, CA 94111
(415) 621-2493

## <u>MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF</u>

Pursuant to Federal Rule of Appellate Procedure 29(a), *amicus curiae* moves for leave to file the concurrently submitted *amicus* brief in support of Defendants-Appellees and in support of affirmance of the judgment below.

The American Civil Liberties Foundation of Northern California, Inc. (ACLU-NC) is the largest affiliate of the American Civil Liberties Union, a nationwide, nonpartisan organization with more than 550,000 members dedicated to the defense and promotion of the guarantees of individual liberty secured by state and federal constitutions and civil rights statutes. ACLU-NC has long defended free speech rights, medical autonomy rights, and equality for lesbian, gay, bisexual, and transgender people.

Because of our unique perspective and abiding interest in the issues now before the Court, *amicus curiae* respectfully seeks permission from the Court to file the brief that accompanies this motion.

DATED: February 5, 2013                         Respectfully submitted,


By: <u>s/ Elizabeth O. Gill</u>
    Elizabeth O. Gill
    Attorney for *Amicus Curiae*
    ACLU OF NORTHERN CALIFORNIA
    FOUNDATION, INC.

No. 12-17681

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DAVID H. PICKUP, et al.,
*Plaintiffs-Appellants*,

v.

EDMUND G. BROWN, et al.,
*Defendants-Appellees*,

and

EQUALITY CALIFORNIA,
*Defendant-Intervenor-Appellee*.

---

On Appeal from the United States District Court
for the Eastern District of California
Case No. 12-CV-02497 (Honorable Kimberly J. Mueller)

---

## BRIEF OF AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA IN SUPPORT OF DEFENDANTS-APPELLEES AND IN SUPPORT OF AFFIRMANCE OF THE JUDGMENT BELOW

---

Elizabeth O. Gill (SBN 218331)
Margaret C. Crosby (SBN 56812)
ACLU FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm St.
San Francisco, CA 94111
(415) 621-2493

## **Table of Contents**

Page

INTRODUCTION AND INTEREST OF AMICUS ...................................................1

ARGUMENT ...........................................................................................................2

I.    SB 1172 Responds to a History of Discrimination Against Lesbians, Gay Men and Bisexuals and the Pathologization of Homosexuality in California. ..........................................................................................................2

II.    SB 1172 Satisfies Free Speech Principles...............................................6

A.  Although Constitutionally Protected, Physicians' Professional Communication May Be Reasonably Regulated...........................6

B.  SB 1172 Codifies Professional Ethical Standards and Is Thus Reasonable. ...............................................................................12

III.    The State's Interests in SB 1172 Outweigh Plaintiffs' Medical Autonomy Interests. ..........................................................................20

A.  Medical Autonomy Interests Warrant the Application of a Balancing Test. ...........................................................................20

B.  In Limiting Access to Unsafe and Discriminatory Mental Health Practices, SB 1172 Satisfies the Balancing Test. .........................26

CONCLUSION .....................................................................................................29

## Table of Authorities

### Cases

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach,*
    495 F.3d 695 (D.C. Cir. 2007)..................................................................25

*Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416 (1983) ........................8

*Beller v. Middendorf,* 632 F.2d 788 (9th Cir. 1980)........................................... 23, 24

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ...............................................................24

*Cal. Med Ass'n v. Lackner*, 124 Cal. App. 3d 28 (1981)........................................28

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ...................................................6, 7

*Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008) .............................................................24

*Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261 (1990) ..............................21

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ...............................................................22

*FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307 (1993)...............................................23

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995).............................................7

*Ginsberg v. New York*, 390 U.S. 629 (1968) ...........................................................23

*Griswold v. Connecticut*, 381 U.S. 479 (1965)........................................................21

*Hernandez-Montiel v. INS*, 225 F.3d 1084 ..............................................................13

*In re Marriage Cases***,** 43 Cal. 4th 757 (2008)...................................................... 4, 13

*In re Primus*, 426 U.S. 412 (1978).........................................................................11

*Lawrence v. Texas*, 539 U.S. 558 (2003).................................................................24

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001).........................................9

## Table of Authorities (Continued)

*Lowe v. S.E.C.*, 472 U.S. 181 (1985) .......................................................................10

*Mitchell v. Clayton*, 995 F.2d 772 (7th Cir. 1993) ....................................................25

*Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352 (6th Cir. 2002) .............................23

*National Ass'n for Advancement of Psychoanalysis v. Cal. Bd.
of Psychology,* 228 F.3d 1043, 1054 (9th Cir. 2000) ..................................... passim

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ........................... 9, 11, 26, 27

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Daugaard*,
799 F. Supp. 2d 1048 (D.S.D. 2011) ................................................................ 8, 10

*Planned Parenthood of Heartland v. Heineman*,
724 F. Supp. 2d 1025 (D. Neb. 2010) .............................................................. 8, 10

*Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833 (1992) ..................... 9, 22

*Poe v. Ullman*, 367 U.S. 497 (1961) ..........................................................................25

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) ...........................24

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ......................10

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ..........................................................26

*Rochin v. California*, 342 U.S. 165 (1952) ...............................................................22

*Sell v. United States*, 539 U.S. 166 (2003) ....................................................... 21, 25

*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942)...............................21

*Stuart v. Huff*, 834 F. Supp. 2d 424 (M.D.N.C. 2011)........................................ 7, 10

*Thomas v. Collins*, 323 U.S. 516 (1945)........................................................ 8, 9, 11

*Troxel v. Granville*, 530 U.S. 57 (2000) ..................................................................24

## Table of Authorities (Continued)

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................. 21, 27

*Washington, et al. v. Harper*, 494 U.S. 210 (1990) ...................................................21

*Witt v. Department of Air Force*, 527 F.3d 806 (9th Cir. 2008) ....................... 24, 25

*Wollschlaeger v. Farmer*, 814 F.Supp.2d 1367 (S.D. Fla. 2012) .............................7

*Youngberg v. Romeo*, 457 U.S. 307 (1982) .............................................................24

**Statutes**

Cal. Admin Code tit. 22, § 51305.1 ..........................................................................27

Cal. Admin Code tit. 22, § 70707.1 ..........................................................................27

Cal. Bus. & Prof. Code § 2936 .................................................................................12

Cal. Bus. & Prof. Code § 865 ........................................................................... passim

Cal. Legis. Serv. Ch. 835 (S.B. 1172), 2012 ...........................................................27

SB1172 ................................................................................................................ passim

**Other Authorities**

American Counseling Association, ACA Governing Council Minutes
   (Apr. 1999) .........................................................................................................17

American Counseling Association, Ethics Committee Opinion, *Ethical
Issues Related to Conversion or Reparative Therapy* (May 2006).............. 13, 14

American Medical Association Policy H-160.991, *Health Care Needs
of the Homosexual Population* ...........................................................................16

American Psychiatric Association, *Position Statement on
Psychiatric Treatment and Sexual Orientation* (1998) ........................................14

iv

## Table of Authorities (Continued)

American Psychiatric Association, Position Statement, *Therapies Focused on Attempts to Change Sexual Orientation (Reparative or Conversion Therapies)*(May 2000)............................................................ 5, 16

American Psychoanalytic Association**,** Position Statement, *Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression* (2012)......16

American Psychological Association, *Ethical Principles of Psychologists and Code of Conduct* (2010) ................................................................12

American Psychological Association, *Report of the American Psychological Ass'n Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009) ...................................................... passim

American Psychological Association, *Resolution*: *Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts* (Aug. 2009) ............................................................. 3, 12, 15, 29

American School Counselor Association, Position Statement, *The Professional School Counselor and LGBTQ Youth* (2007) .........................17

Caitlin Ryan, *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009) ...........................................................15

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1782 (2004)........................................................................................11

National Association of Social Workers, Position Statement, *"Reparative" and "Conversion" Therapies for Lesbians and Gay Men* (1997).......................14

Pan American Health Organization**,** Position Statement, *"Cures" for an Illness that does not Exist* (2012)......................................................... 14, 16

Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 953 (2007) ...................10

<u>**Table of Authorities (Continued)**</u>

William N. Eskridge, *The Supreme Court of California 2007-2008: Foreward: The Marriage Cases – Reversing the Burden of Inertia in a Pluralist Constitutional Democracy*, 97 Calif. L. Rev. 1785, 1789-1802 (Dec. 2009)..............................................................................4

## INTRODUCTION AND INTEREST OF AMICUS

SB 1172 amends California's Business and Professions Code by adding "engaging in sexual orientation change efforts with a patient under the age of 18" to the list of unprofessional conduct that can result in a state licensing board disciplining a licensed mental health professional.  Cal. Bus. & Prof. Code § 865. "Therapies" to change a person's sexual orientation – generally known as SOCE, conversion therapy or reparative therapy – are based on the long-discredited notion that being gay, lesbian, or bisexual is a mental disorder in need of a "cure." Historically, these therapies have perpetuated and legitimized state-sanctioned discrimination against gay men, lesbians and bisexuals.  Through SB 1172, California has codified widespread consensus in the mental health profession that "therapy" to change a person's sexual orientation is not efficacious, poses a risk of serious harm, and is unethical.  The measure serves both to protect consumers and to avoid state sanction of harmful and discriminatory professional practices.

This Court now hears appeals in two constitutional challenges to SB 1172 – *Pickup v. Brown*, No. 2:12-CV-02497-KJM-EFB, and *Welch v. Brown*, No. 2:12-CV-02484-WBS-KJN.  *Amicus* the American Civil Liberties Union of Northern California submits this brief in both cases.[1]  As an organization long dedicated to

---

[1] All parties consented to the filing of this brief in *Welch*. A motion for leave to file accompanies the filing of this brief in *Pickup*. Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, no party or party's counsel authored this brief in

protecting First Amendment rights and autonomy to make personal medical decisions, as well as opposing discrimination against lesbian, gay, and bisexual people, *amicus* has a strong interest in the proper resolution of this controversy.

In brief, *amicus* supports SB 1172's constitutionality, and urges affirmance of the district court's decision in *Pickup* and reversal of the district court's decision in *Welch*. *Amicus*, however, strongly disagrees with the district court's analysis in *Pickup* that the First Amendment does not apply to regulation of doctor-patient speech and that only rational basis review applies to plaintiffs' medical autonomy claims. Instead, we argue below that (1) although the First Amendment does apply to regulation of doctor-patient speech, SB 1172 need only meet a "reasonable regulation" standard as it is consistent with the norms of medical practice; and (2) SB 1172 does not violate plaintiffs' medical autonomy interests, as the state's interests in the law outweigh plaintiffs' in accessing SOCE under a balancing test.

## ARGUMENT

### I.  SB 1172 Responds to a History of Discrimination Against Lesbians, Gay Men and Bisexuals and the Pathologization of Homosexuality in California.

Forty years ago, the American Psychiatric Association removed homosexuality from its Diagnostic and Statistical Manual of Mental Disorders.

---

whole or in part; no part or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except *amicus curiae* contributed money to fund the preparation or submission of this brief.

Every major medical and mental health association has now rejected the notion that homosexuality is a mental illness. Indeed, it is the "longstanding consensus of the behavior and social sciences and the health and mental health profession . . . that homosexuality per se is a normal and positive variation of human sexual orientation." American Psychological Association, *Resolution: Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts*, Aug. 2009 (hereinafter "APA Resolution").[2]

The change in the science followed a history of pervasive social opprobrium of homosexuality in this country, in which prejudice and stigma fueled the pathologization of homosexuality by the medical and mental health professions that, in turn, helped to legitimize state-sanctioned discrimination against lesbians, gay men, and bisexuals. *See* Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation at 11, 21-23 (2009) (hereinafter "APA Task Force Report") (describing professional reliance on untested psychological theories in classifying homosexuality as a mental disorder and empirical research that have proved these theories wrong).[3] The pathologization of homosexuality led licensed mental health professionals to subject gay men, lesbians, and bisexuals to psychotherapies and behavioral

---

[2] *Available at* http://www.apa.org/about/policy/sexual-orientation.aspx.

[3] *Available at* http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf.

interventions – ranging from troubling to barbaric – to alter their sexual

orientation.[4]  States like California themselves played an active role in trying to

"cure" gay people.  *See* William N. Eskridge, *The Supreme Court of California*

*2007-2008: Foreword: The Marriage Cases – Reversing the Burden of Inertia in a*

*Pluralist Constitutional Democracy*, 97 Calif. L. Rev. 1785, 1789-1802 (Dec.

2009) (describing California's history of treating gay people as "inverts" and

"degenerates," including civil commitment to "remove [gay people] from civil

society and 'cure' them," often through experimental therapies such as shock

treatments and lobotomies).

　　California has now recognized the prejudice that led it to discriminate

against lesbians, gay men, and bisexuals, and it subjects laws that discriminate

based on sexual orientation to the highest level of constitutional scrutiny.  *In re*

*Marriage Cases*, 43 Cal. 4th 757; *see also id.* at 821 ("California has repudiated

past practices and policies that were based on a once common viewpoint that

denigrated the general character and morals of gay individuals, and at one time

even characterized homosexuality as a mental illness rather than as simply one of

---

[4] For example, early sexual orientation change efforts included "sexual intercourse
with the other sex" and "aversion treatments" such as "inducing nausea, vomiting,
or paralysis; providing electric shocks; or having the individual snap an elastic
band around the wrist when the individual became aroused to same-sex erotic
images or thoughts . . . covert sensitization, shame aversion, systematic
desensitization, orgasmic reconditioning, and satiation therapy."  APA Task Force
Report at 22.

the numerous variables of our common and diverse humanity.").  Yet the

pathologization of homosexuality continues in California in the form of modern

SOCE.  As defendant's expert Lee Beckstead explains:

> A review of the literature in the field of [SOCE] reveals that the premise underlying SOCE is that homosexuality is a mental disorder, and that it is counter to some practitioners' religious and/or personal beliefs. Practitioners of SCOE [sic] believe that the only way to manage the potential harm from this 'disorder' is to try to reduce or eliminate same-sex feelings and hope to develop heterosexual ones. . . .

*Pickup* ER at 183; *see also* American Psychiatric Association, *Position Statement*

*on Therapies Focused on Attempts to Change Sexual Orientation (Reparative or*

*Conversion Therapies)*, May 2000 (hereinafter "APA 2000 Position Statement")

("The theories of 'reparative' therapists define homosexuality as either a

developmental arrest, a severe form of psychopathology, or some combination of

both.  In recent years, noted practitioners of "reparative" therapy have openly

integrated older psychoanalytic theories that pathologize homosexuality with

traditional religious beliefs condemning homosexuality." (citations omitted)).[5]

Plaintiffs describe their own work in similar ways.  *See, e.g., Pickup* ER

367(plaintiff Pickup provides therapy to minors "to help them reduce unwanted

same-sex attractions and maximize their heterosexual potential").

---

[5] *Available* at http://www.psychiatry.org/advocacy--newsroom/position-statements.

In enacting SB 1172, the California Legislature acted in light of the state's history of invidious discrimination and prejudice against lesbian, gay, and bisexual people, including harmful and unethical efforts to "cure" homosexuality by the medical and mental health professions and the State of California itself. By preventing mental health providers from engaging in SOCE while operating under a state license, SB 1172 seeks to extricate the State from this legacy of discrimination and ensure that state-licensed professionals treat lesbian, gay, and bisexual patients in accordance with basic standards of care and competence.

## II.     SB 1172 Satisfies Free Speech Principles.

### A.     Although Constitutionally Protected, Physicians' Professional Communication May Be Reasonably Regulated.

As this Court has found, the state has the power to regulate the practice of medicine, even when the medical treatment involves words instead of scalpels or pills. *See National Association for Advancement of Psychoanalysis v. Cal. Bd. of Psychology ("NAAP")*, 228 F.3d 1043, 1054 (9th Cir. 2000) ("That psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amendment protection."). Yet this Court has also recognized that doctor-patient communication is not entirely outside the protection of the First Amendment. *See id.* ("The communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation"); *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) ("Being a member of a

regulated profession does not . . . result in a surrender of First Amendment rights.
. . . To the contrary, professional speech may be entitled to 'the strongest
protection our Constitution has to offer.'") (quoting *Florida Bar v. Went For It,
Inc.*, 515 U.S. 618, 634 (1995)); *contra Pickup* ER at 19. The critical question in
these cases, as here, is what level of constitutional protection is appropriate.

Courts have applied strict scrutiny to regulation of doctor-patient
communication in several circumstances. Strict scrutiny has been applied to
regulation that is not germane to the practice of medicine. *See Conant*, 309 F.3d at
637 (applying strict scrutiny to a law that prohibited doctors from providing
medically accurate information about the health benefits of marijuana based on the
concern that the information would encourage illegal conduct by the patient); *see
also Wollschlaeger v. Farmer*, 814 F.Supp.2d 1367 (S.D. Fla. 2012) (applying
strict scrutiny to a law that prohibited doctors from asking patients medically
relevant information about firearms usage based on an ostensible concern about
protecting firearm owners' Second Amendment rights).

Strict scrutiny has also been applied when regulation forces doctors to
provide patients with medically inaccurate or medically unnecessary information.
*See*, *e.g.*, *Stuart v. Huff*, 834 F. Supp. 2d 424, 431-32 (M.D.N.C. 2011) (applying
strict scrutiny to law that required doctors to perform ultrasound and, contrary to
informed consent standards, show and describe ultrasound images prior to abortion

procedure); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Daugaard*, 799 F. Supp. 2d 1048, 1070-71 (D.S.D. 2011) (applying strict scrutiny to law that required doctors to provide "untruthful and misleading" information prior to abortion procedure); *Planned Parenthood of Heartland v. Heineman*, 724 F. Supp. 2d 1025, 1047-48 (D. Neb. 2010) (applying strict scrutiny to law that required doctors to provide "untruthful, misleading and irrelevant information" prior to abortion procedure); *Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 472 n.16 (1983) (O'Connor, J., dissenting) ("informed consent provisions may . . . violate the First Amendment rights of the physician if the State requires him or her to communicate its ideology").

Strict scrutiny may also apply to doctor's personal or political speech outside the practice of medicine. *See Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("[T]he state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought[.]"); *see also id.* at 545 ("Very many are the interests which the state may protect against the practice of an occupation, very few are those it may assume to protect against the practice of propagandizing by speech or press. These are thereby left great range of freedom."); *accord NAAP*, 228 F.3d at 1055.

Where regulation of doctor-patient communication is consistent with the norms of medical practice, however, then it falls into the realm of reasonable medical regulation and strict scrutiny does not apply. *See Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 884 (1992) (plurality); *see also NAAP*, 228 F.3d at 1054 (quoting *Thomas*, 323 U.S. at 544 (Jackson, J., concurring) ("The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money.  When it does so through the practice of a calling, the state may have an interest in shielding the public from the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency.").[6]

To determine whether a regulation is consistent with norms of medical practice, the court must conduct an independent examination of the record and not simply defer to legislative assertions.  "[T]he category of professional speech can

---

[6] In this respect, the limits the First Amendment places on the state's ability to regulate doctor-patient communications are similar to the limits the First Amendment places on the state's ability to regulate the speech between attorneys and clients.  *Compare Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) (state's ban on in-person client solicitation, which had "long been viewed as inconsistent with the profession's ideal of the attorney-client relationship and as posing a significant potential for harm to the prospective client," constitutional as a reasonable regulation as it fell "within the State's proper sphere of economic and professional regulation" ) *with Legal Services Corp. v. Velazquez*, 531 U.S. 533, 544 (2001) (prohibition on attorney recipients of federal funds from engaging in representation involving effort to amend or otherwise challenge validity of existing welfare laws unconstitutional restriction on attorneys' free speech rights as it "distorts the legal system by altering the traditional role of the attorneys").

be determined only by reference to the legitimate practice of medicine," and "whether the object of statutory regulation is professional speech, or some other form of more highly protected speech, is a question of constitutional law that must be independently determined by a court." Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 953 (2007); *see also Lowe v. S.E.C.*, 472 U.S. 181, 230 (1985) (White, J., concurring) ("The question whether any given legislation restrains speech or is merely a permissible regulation of a profession is one that we ourselves must answer if we are to perform our proper function of reviewing legislation to ensure its conformity with the Constitution."); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-96 (1988) ("state labels cannot be dispositive of [the] degree of First Amendment protection").[7]

If a regulation is consistent with the norms of medical practice, then it makes little sense to assess the regulation for content- and viewpoint-neutrality. *Contra*

---

[7] For example, in the abortion context, courts have independently surveyed the consensus of professional organizations with specialized expertise in reproductive health and held unconstitutional laws that would have compelled physicians to provide patients with information about the risks of abortion deemed inaccurate by the profession. *See Daugaard*, 799 F. Supp. 2d at 1071-72; *Heineman*, 724 F. Supp. 2d at 1048. Similarly, in assessing the level of scrutiny applicable to laws requiring doctors to display and describe ultrasound images to abortion patients, courts have looked to medical evidence to determine whether such requirements are consistent with the legitimate practice of medicine. *See Huff*, 834 F. Supp. 2d at 429, 431-32 & n.7.

*Welch* ER 19-34. Much professional regulation, including regulation of professional speech, is content-based. *See* Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1782 (2004) (describing areas of the law that regulate speech based on its content, but that have not been subjected to a First Amendment analysis of content- and viewpoint-neutrality – such as, "content-based regulation of trademarks, the pervasive and constitutionally untouched law of fraud, almost all of the regulation of professionals, virtually the entirety of the law of evidence, large segments of tort law, and that vast domain of criminal law that deals with conspiracy and criminal solicitation").[8]

Thus, the question here should be whether SB 1172 is consistent with the norms of medical practice. If it is, then it should be deemed a reasonable medical regulation not subject to strict scrutiny under the First Amendment.

---

[8] Although this Court in *NAAP* assessed the content- and viewpoint-neutrality of the licensing requirement at issue in that case, the concern expressed by the court was with a law making "'it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.'" 228 F.3d at 1055 (quoting *Thomas*, 323 U.S. at 545 (Jackson, J., concurring). As noted above, we agree that such a law should be subject to strict scrutiny, but not because it is not content- or viewpoint-neutral. Indeed, the attorney anti-solicitation regulation at issue in *Ohralik*, 436 U.S. at 447, cited approvingly by the *NAAP* court, has itself been characterized as a content-based restriction on attorney speech. *See In re Primus*, 426 U.S. 412, 441-442 (1978) (Rehnquist, J., dissenting).

**B.     SB 1172 Codifies Professional Ethical Standards and Is Thus Reasonable.**

In specifying that mental health professionals in California provide their patients with safe and competent care, SB 1172 simply elaborates on California's existing professional regulations.[9]  Independent investigation reveals widespread consensus within the medical and mental health professions that homosexuality is a normal and positive variation of human sexuality; that therapeutic efforts to change a person's sexual orientation are unnecessary, counterproductive, and pose risk of serious harm; and that engaging in the recognized, modern-day practice of SOCE falls outside the provision of competent care and is unethical.

There is no reliable scientific evidence that a person's sexual orientation can be changed.  *See* APA Resolution ("there is insufficient evidence to support the use of psychological interventions to change sexual orientation")[10]; American

---

[9] California – like virtually every other state – already requires mental health providers to adhere to the standards of care and competence for their professions. For example, California has established as the standards of ethical conduct relating to the practice of psychology the "Ethical Principles and Code of Conduct" published by the American Psychological Association, and it requires California's Board of Psychology (which oversees all state-licensed psychologists) to apply those standards in all board enforcement policies and disciplinary case evaluations. *See* Cal. Bus. & Prof. Code § 2936.  General Principle A of this code of conduct, entitled "Beneficence and Nonmaleficence," provides that "psychologists strive to benefit those with whom they work and take care to do no harm."  APA, Ethical Principles of Psychologists and Code of Conduct (2010), *available at* http://www.apa.org/ethics/code/index.aspx?item=3.

[10] *Available at* http://www.apa.org/about/policy/sexual-orientation.aspx.

Counseling Association, Ethics Committee Opinion, *Ethical Issues Related to Conversion or Reparative Therapy*, May 22, 2006 (hereinafter "ACA Ethics Opinion") ("We found no scientific evidence published in psychological peer-reviewed journals that conversion therapy is effective in changing an individual's sexual orientation from same-sex attractions to opposite-sex attractions.").[11] This Court and other courts have also concluded that a person's sexual orientation is an immutable characteristic for purpose of equal protection law. *See, e.g., Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093-94 (9th Cir. 2000); *In re Marriage Cases*, 43 Cal. 4th 757, 843 (Cal. 2008).

Nor is there reliable evidence that SOCE is an effective "treatment." SOCE, at its very core, aims to "treat" something that need not be treated at all – one's homosexuality or bisexuality. Even when SOCE practices purportedly are not aimed at treating a person's orientation, per se, but the distress one may feel as a result of it, the consensus of mental health professional associations is that there is no evidence that trying to change a person's sexual orientation is an effective treatment for that distress – even for those individuals who state a desire to change their sexual orientation. *See* APA Task Force Report at 42-43, 54-55; National Association of Social Workers, Position Statement, *"Reparative" and*

---

[11] *Available at*
http://www.counseling.org/pressroom/newsreleases.aspx?AGuid=b68aba97-2f08-40c2-a400-0630765f72f4.

*"Conversion" Therapies for Lesbians and Gay Men,* 1997 ("No data demonstrates that reparative or conversion therapies are effective, and, in fact, they may be harmful.")[12]; Pan American Health Organization**,** Position Statement, *"Cures" for an Illness that does not Exist,* 2012 (hereinafter Pan Am. Health Org. Position Statement) (conversion therapies "lack medical justification").

There is also evidence that trying to change someone's sexual orientation poses a risk of serious harm – including depression and suicide. *See* American Psychiatric Association, *Position Statement on Psychiatric Treatment and Sexual Orientation*, 1998 ("The potential risks of reparative therapy are great, including depression, anxiety and self-destructive behavior, since therapist alignment with societal prejudices against homosexuality may reinforce self-hatred already experienced by the patient."); APA Task Force at 3 (finding "evidence to indicate that individuals experienced harm from SOCE"); ACA Ethics Opinion ("We did conclude that research published in peer-reviewed counseling journals indicates that conversion therapies may harm clients.")[13]; Pan Am. Health Org. Position Statement (conversion therapies "represent a serious threat to the health and well-being of affected people.").  The APA has also concluded that any potential or

---

[12] *Available at* http://www.socialworkers.org/diversity/lgb/reparative.asp.

[13] *Available at* http://www.counseling.org/pressroom/newsreleases.aspx?AGuid=b68aba97-2f08-40c2-a400-0630765f72f4

perceived benefits from SOCE can be achieved through alternative therapeutic approaches that do not pose the same risk of harm.  APA Resolution at 3.

Research on minors is "limited" but the APA Task Force found "no research demonstrating that providing SOCE to children or adolescents has an impact on adult sexual orientation."  APA Task Force Report at 4.  Moreover, research does show that lesbian, gay, and bisexual youth are a particularly vulnerable population. APA Resolution 2-3 ("sexual minority children and youth are especially vulnerable populations with unique developmental tasks, who lack adequate legal protection from involuntary or coercive treatment, and whose parents and guardians need accurate information to make informed decisions regarding their development and well-being").[14]  Given the vulnerability of lesbian, gay, and bisexual youth, the APA "advises parents, guardians, young people, and their families to avoid sexual orientation change efforts that portray homosexuality as a mental illness or developmental disorder."  APA Resolution   at 3.

---

[14] This is particularly the case for lesbian, gay, and bisexual youth with non-accepting families, who are more likely to seek SOCE for their children.  In one study, lesbian, gay, and bisexual young adults who reported higher levels of family rejection during adolescence were 8.4 times more likely to report having attempted suicide, 5.9 times more likely to report high levels of depression, 3.4 times more likely to use illegal drugs, and 3.4 times more likely to report having engaged in unprotected sexual intercourse compared with peers from families that reported no or low levels of family rejection.  Caitlin Ryan, *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009).

Based on this research, it is the clear consensus of the medical and mental health professions that "therapies" attempting to change a person's sexual orientation violate the standard of care and are unethical, and professional medical and mental health associations therefore advise practitioners not to provide these therapies to patients. *See* APA 2000 Position Statement (recommending that "ethical practitioners refrain from attempts to change individual's sexual orientation, keeping in mind the medial dictum to first, do no harm"); Pan Am. Health Org. Position Statement ("These supposed conversion therapies constitute a violation of the ethical principles of health care."); AMA Policy H-160.991, *Health Care Needs of the Homosexual Population* (the Association "opposes[ ] the use of "reparative" or "conversion" therapy that is based upon the assumption that homosexuality per se is a mental disorder or based upon the a priori assumption that the patient should change his/her homosexual orientation")[15]; American Psychoanalytic Association**,** Position Statement, *Attempts to Change Sexual Orientation, Gender Identity, or Gender Expression*, 2012 ("Psychoanalytic technique does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender expression.  Such directed efforts are against fundamental principles of psychoanalytic treatment and

---

[15] *Available at* https://www.ama-assn.org/ama/pub/about-ama/our-people/member-groups-sections/glbt-advisory-committee/ama-policy-regarding-sexual-orientation.page.

often result in substantial psychological pain by reinforcing damaging internalized attitudes.")[16]; Action by American Counseling Association Governing Council, 1999-APR ("The ACA Governing Council adopts a position opposing the promotion of 'reparative therapy' as a 'cure' for individuals who are homosexual").[17]

Given this consensus, it is well within the norms of the medical and mental health professions for California to subject licensed mental health providers to professional sanction for engaging in SOCE with minors. SB 1172's prohibition is narrow and closely tied to the medical consensus: licensed mental health providers may not engage in practices that actually seek to change a minor's sexual orientation. Cal. Bus. & Prof. Code § 865(b) ("'Sexual orientation change efforts' means any practices by mental health providers that seek to change sexual

---

[16] *Available at*
http://www.apsa.org/About_APsaA/Position_Statements/Attempts_to_Change_Sexual_Orientation.aspx

[17] *Available at*
http://www.counseling.org/Sub/Minutes/Governing_Council/1999_0412.pdf . *See also* ACA Ethics Opinion ( "the ACA Ethics Committee strongly suggests that ethical professional counselors do not refer clients to someone who engages in conversion therapy or, if they do so, to proceed cautiously only when they are certain that the referral counselor fully informs clients of the unproven nature of the treatment and the potential risks and takes steps to minimize harm to clients."); American School Counselor Ass'n, Position Statement, *The Professional School Counselor and LGBTQ Youth*, 2007 ("It is not the role of the professional school counselor to attempt to change a student's sexual orientation or gender identity."), *available at* http://www.schoolcounselor.org/files/PS_LGBTQ.pdf.

orientation."). The statute explicitly excludes from its coverage therapies that may be appropriate for minors who are exploring their sexual orientation or trying to find ways to deal with same-sex attractions. So long as licensed practitioners are not seeking to change a minor's sexual orientation, they may engage in a wide range of psychotherapies that help "facilitat[e] clients' coping, social support, and identity exploration and development" with regard to their sexual orientation; "provide acceptance, support, and understanding of clients" who are exploring, dealing with, or exploring their sexual orientation; and/or are "sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices." Cal. Bus. & Prof. Code § 865(b)(2).

SB 1172's scope is therefore far less broad than the *Pickup* plaintiffs suggest. Contrary to plaintiffs' suggestion, *Pickup* Op. Br. at 40, 42, the statute has no impact on a licensed mental health provider's ability to disseminate "educational information" about SOCE or to engage in public or private debate about appropriate therapeutic approaches. Plaintiffs also repeatedly assert that that the statute bars licensed practitioners from even discussing with minor patients their desire to reduce or eliminate same-sex behavior, attractions, or change their sexual orientation identity. *Pickup* Op. Br. at 4, 36. But this is not what the statute says. SB 1172 bans practices that are aimed at "changing" a person's sexual orientation, not therapies that help people otherwise cope with same-sex attractions

18

or explore their sexual orientation identity through evidence-based strategies consistent with professional standards of care.

Finally, SB 1172 does not require licensed therapists to "affirm" a patient's same-sex attractions or lesbian, gay, or bisexual identity in the sense that a therapist must adopt and express approval for those attractions or identity. *Pickup* Op. Br. at 4, 18, 31, 34. First, the statute does not require licensed mental health professionals to do *anything*; it subjects them to discipline for engaging in sexual orientation change efforts. Second, the types of therapeutic interventions SB 1172 carves *out* of its definition of "sexual orientation change efforts" simply capture what the profession considers "multiculturally competent" and "affirmative therapeutic interventions," APA Task Force Report at 14, that may be appropriate and effective when treating sexual minorities who are experiencing distress related to their sexual orientation. The word "affirmative" is a term of art. It does not mean that a licensed therapist is required to adopt and express a particular ideology towards homosexuality with their patients (something licensed professionals practicing competent client-centered care are not supposed to be doing in any event). Instead, as the APA explains: an "affirmative approach" is therapy that is:

> [S]upportive of clients' identity development *without* a priori treatment goals for how clients identify or express their sexual orientations. Thus, a multiculturally competent affirmative approach aspires to understand the diverse personal and cultural influences on clients and engages clients to determine (a) the ultimate goals for their identity process; (b) the behavioral expression of their sexual orientation; (c) their public and private social

roles; (d) their gender roles, identities, and expression; (e) the sex and gender of their partner; and (f) the forms of their relationships.

*Id* at 14. This recommended approach is not just "helping sexual minorities accept and adopt a gay or lesbian identity," *id.*, but rather working with individuals to define and reach their own goals – without predetermined outcomes or stigmatization – for how they identify themselves.

SB 1172 is therefore a reasonable regulation that is fully consistent with professional medical and mental health norms, and it does not run afoul of the First Amendment.

## III. The State's Interests in SB 1172 Outweigh Plaintiffs' Medical Autonomy Interests.

### A. Medical Autonomy Interests Warrant the Application of a Balancing Test.

The Supreme Court has consistently recognized medical autonomy as a protected liberty interest, and it should recognize such an interest here. Although plaintiffs do not raise a medical autonomy claim per se,[18] the *Pickup court* nonetheless erred in analyzing the constitutionality of SB 1172 under mere rational-basis review. *Pickup* ER 42-44.

---

[18] Plaintiffs argue that a fundamental rights analysis should apply to the state law, but only in the context of plaintiffs' parental rights. The district court, however, properly analyzed the right at issue as "the right to choose a specific mental health treatment . . . ." *Pickup* ER at 32.

Although the Supreme Court has yet to articulate an across-the-board test for a state's denial of access to a particular medical treatment, it has always looked with suspicion at a state's imposition of unwanted medical treatment, and in analyzing such imposition, consistently applied a balancing test. *See Sell v. United States*, 539 U.S. 166 (2003) (applying a balancing test to evaluate burdens on "constitutionally protected liberty interest [for a criminal defendant] in avoiding the unwanted administration of antipsychotic drugs"); *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261 at 278–79 (1990), 110 S.Ct. 2841 (balancing "protected liberty interest" in refusing unwanted medical treatment against the government interest in promoting life); *Washington, et al. v. Harper*, 494 U.S. 210 at 223 (1990), 110 S.Ct. 1028 (weighing a prisoner's interest in refusing drugs against the government's interest in promoting a safe prison environment).

Similarly, the Court has recognized fundamental liberty interests in making decisions affecting one's body and course of life, including access to particular medical treatments and procedures. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that . .. the 'liberty' specially protected by the Due Process Clause includes the rights to . . . to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); . . . to use contraception, *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Eisenstadt v. Baird*,

405 U.S. 438 (1972); to bodily integrity, *Rochin v. California*, 342 U.S. 165 (1952), and to abortion, *Casey*,[505 U.S. at 851].").

Of course, SB 1172 applies only to one type of "therapy" geared towards alleviating distress arising out of same-sex attraction (and it only bans that for minors). It is also a licensing regulation and not a criminal ban. Because it does ban any licensed practitioner from offering a particular type of "therapy," however, the law should be assessed under a balancing test approach to questions of medical autonomy. The *Pickup* court's approach to assessing plaintiffs' liberty interest – whether they had a fundamental right in SOCE itself – is too narrow. Under the court's approach, only those types of medical treatment or practice that have already been deemed protected liberty interests (e.g., birth control and abortion), should continue to be treated as such. Not only does this make little sense given the constant evolution of medical treatment, but it is not how the courts that recognized protection for those particular treatments or practices arrived at their conclusions in the first place.[19]

---

[19] This does test would not endanger existing regulatory schemes. As discussed below, regulations to ensure that patients are not exposed to unsafe or ineffective treatments will usually pass this balancing test without difficulty, but the courts have the obligation to independently examine the interests at stake.

Even worse, the *Pickup court* concluded that a state ban on a particular medical practice need not have any scientific basis whatsoever in order to pass constitutional muster under rational basis review:

> Even if all of the studies and reports upon which the California Legislature relied were inconclusive or flawed, SB 1172 still would be a valid legislative enactment. A legislative choice such as this "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993); *see also Ginsberg*, 390 U.S. at 642-43 (finding a statute prohibiting the sale of obscene materials to minors had a rational basis even though studies about its harmfulness were inconclusive); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 370-71 (6th Cir. 2002) (upholding state law as rational even though legislature relied upon "anecdotes collected from newspapers" rather than studies).

*Pickup* ER at 44. This is a troubling and dangerous precedent and it should be strongly repudiated by this Court. If popularly-elected legislatures can ban any medical practice – regardless of the medical profession's consensus as to the efficacy or even necessity of that practice – then regulation of the profession could be driven entirely by the ideological goals of the legislatures.

In clarifying the appropriate test for a state's ban on a particular medical practice, this Court need not specify a particular tier of scrutiny, as the scrutiny required by a balancing test is necessarily flexible and case-specific. As then Judge Kennedy recognized when writing for this Court in *Beller v. Middendorf*:

> The rather formal three-tier analysis of the Court's recent equal protection decisions differs somewhat from its less categorical approach when questions of substantive due process are involved. Recent decisions indicate that substantive due process scrutiny of a

> government regulation involves a case-by-case balancing of the nature of the individual interest allegedly infringed, the importance of the government interests furthered, the degree of infringement, and the sensitivity of the government entity responsible for the regulation to more carefully tailored alternative means of achieving its goals.

632 F.2d 788, 807 (9th Cir. 1980), *abrogated by Bowers v. Hardwick*, 478 U.S.

186 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003). In *Witt v.*

*Department of Air Force*, 527 F.3d 806 (9th Cir. 2008), this Court reaffirmed

*Beller*'s flexible approach and explained that the Fourteenth Amendment protects

liberty interests in autonomy even when the interest falls short of a "fundamental

right" that triggers strict scrutiny.

Because medical autonomy is a constitutionally protected liberty interest and

because SB 1172 deprives plaintiffs of state-sanctioned access to particular

practices currently offered by state-licensed mental health providers, the proper test

here would be to weigh the government's interest in SB 1172 against plaintiffs'

countervailing liberty interest under a balancing test that is more rigorous than

rational-basis review. *Accord See Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008);

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008); *Witt v. Dep't of*

*the Air Force*, 527 F.3d 806 (9th Cir.2008); *see also Troxel v. Granville*, 530 U.S.

57 at 67 (2000) (invalidating law burdening due process interest in parental

autonomy without applying either rational basis or strict scrutiny); *Youngberg v.*

*Romeo*, 457 U.S. 307 at 320-22 (1982), (balancing liberty interest of an individual

to avoid bodily restraint against the state's asserted reason for the restraint); *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting).

This approach is not at odds with the conclusion reached in *NAAP*, 228 F.3d 1043. In that case, this Court generally concluded that patients of psychoanalysts do not have "a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *Id.* at 1050. Yet the issue in that case, as well as in the case on which that court relied – *Mitchell v. Clayton*, 995 F.2d 772 (7th Cir. 1993) – was not a state ban on a particular treatment, but a licensing regulation that simply limited the available pool of providers. Because patients could still access the medical treatment (psychoanalysis) from state-licensed practitioners, their medical autonomy interest was not implicated. Moreover, to the extent that the *NAAP* court asked whether there was a "right" to a particular treatment, subsequent cases such as *Sell*, 539 U.S. 166, and *Witt*, 527 F.3d 806, have clarified that courts must apply a balancing test to evaluate infringements on liberty interests that fall short of fundamental rights.[20]

---

[20] Similarly, this Court's decision in *Witt* demands a higher level of scrutiny than the D.C. Circuit applied in *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, although we agree with the result in that case. 495 F.3d 695 (D.C. Cir. 2007) (en banc) (applying rational-basis review and rejecting a claim that patients had a substantive due process right to access medications that passed limited safety trials but have not been proven safe and effective in accordance with FDA regulations).

**B.      In Limiting Access to Unsafe and Discriminatory Mental Health Practices, SB 1172 Satisfies the Balancing Test.**

Under a test balancing their liberty interests against the state's interests, plaintiffs cannot prevail on the merits of their medical autonomy claims.  The governmental interests underlying SB 1172 outweigh the modest infringement on patient autonomy in this case.

As described above, the government's interest in SB 1172 is twofold – protecting minor consumers by prohibiting the state-sanctioned administration of practices the medical profession deems incompetent, unsafe, and unethical care and eliminating state-supported discrimination against lesbians, gay men, and bisexuals.  Both of these interests are important – indeed, both have been deemed compelling.  *See*, *e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (a state's "commitment to eliminating discrimination" is a "goal . . . [that] plainly serves compelling state interests of the highest order."); *Ohralik*, 436 U.S. 447 at 462 ("the State bears a special responsibility for maintaining standards among members of the licensed professions," especially member of the bar, and therefore the "State has a legitimate and indeed 'compelling' interest in preventing those aspects of [attorney] solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct.'").

California has an important interest in protecting patients from treatment that poses real risk of serious harm and is not efficacious.  As discussed above, there is

no reliable scientific evidence that a person's sexual orientation can be changed or that SOCE is an effective "treatment" for any distress one may experience related to their sexual orientation or the social stigma that may attach to it. *See supra* at pp. 12-13. There is evidence, however, that trying to "change" someone's sexual orientation poses a risk of serious harm to patients. *See supra* at pp. 14-15. And again, it the consensus of the medical and mental health professional associations that sexual orientation change efforts violate the standard of competent care, and are unsafe and unethical.

California also has an important interest in prophylactically protecting a vulnerable group from a practice that has a history of abuse. *See Washington*, 521 U.S. at 731-32 (Souter, J., concurring); *id.* at 732 (recognizing "the real risk of subtle coercion and undue influence in end-of-life situations," and citing the protection of the poor, the elderly and the disabled as part of the state's interest in banning physician-assisted suicide). Here, as the state documented in its legislative findings, the youth most likely to seek SOCE – lesbian, gay, and bisexual whose families and religious communities reject their sexual orientation – constitute a particularly vulnerable population. 2012 Cal. Legis. Serv. Ch. 835 (S.B. 1172), Section 1(m) (West).[21]

---

[21] In an analogous context, California requires informed consent for sterilizations and generally prohibits doctors from performing sterilizations on minors. Cal. Admin Code tit. 22, § 51305.1(a)(1); Cal. Admin Code tit. 22, § 70707.1(A). The

27

When judged against these governmental interests, SB 1172 places a comparatively small burden on plaintiff's medical autonomy interests. As even its providers recognize, SOCE is simply one type of "treatment" for clients who seek mental health counseling for same-sex attraction. *See*, *e.g.*, *Pickup* ER 377 (plaintiff Rosik explaining that "[t]he majority of children that come to my office dealing with same-sex attractions are not interested in sexual orientation change efforts."). Minors in California who are experiencing distress caused by same-sex attraction may, under the explicit terms of SB 1172, still obtain therapy intended to provide them with "acceptance, support, and understanding" or "the facilitation of . . . coping, social support, and identity exploration and development." Cal. Bus. & Prof. Code § 865(b). And they may obtain such therapy from the licensed mental health providers who currently offer SOCE, so long as the provider does not attempt to change the minor's sexual orientation.

Finally, SB 1172 is carefully tailored to protect minors from distinct practices that have been found by the mental health profession to lack efficacy and that have the potential to cause serious harm, while at the same time allowing for a range of therapies that would address a minor's concerns regarding his or her sexual orientation. Section (b)(2) of the law explicitly provides that SOCE does

---

basis for this unique restriction on a medical treatment that has long been recognized and safe and effective is the history of its abuse. *See Cal. Med Ass'n v. Lackner*, 124 Cal. App. 3d 28, 41-42 (1981).

*not* include "psychotherapies that (A) provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development . . .; and (B) do not seek to change sexual orientation."  Cal. Bus. & Prof. Code § 865(b)(2).  Professional organizations have also concluded that any potential or perceived benefits from SOCE can be achieved through alternative therapeutic approaches that do not pose the same risk of harm.  APA Resolution at 3.

## CONCLUSION

Because SB 1172 is a reasonable regulation consistent with medical and mental health professional norms and because California's interests in the law outweigh plaintiffs' interest in accessing SOCE for minors from licensed mental health providers, plaintiffs in both *Welch* and *Pickup* are unlikely to prevail on the merits of their constitutional claims.  This Court should therefore reverse the decision of the district court in *Welch* and affirm the decision of the district court in *Pickup*, on different grounds.

DATED: February 5, 2013                    Respectfully submitted,

                                           By:  s/ Elizabeth O. Gill
                                                Elizabeth O. Gill
                                                Attorney for *Amicus Curiae*
                                                ACLU OF NORTHERN
                                                CALIFORNIA FOUNDATION, INC.

29

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,984 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

DATED: February 5, 2013        By:  <u>s/ Elizabeth O. Gill</u>
                                    Elizabeth O. Gill
                                    Attorney for *Amicus Curiae*
                                    ACLU OF NORTHERN
                                    CALIFORNIA FOUNDATION, INC.

# CERTIFICATE OF SERVICE

Case Name:     **David Pickup, et al. v.**          No.     **12-17681**
                **Brown, et al.**

I hereby certify that on <u>February 5, 2013</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF;**

**BRIEF OF AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA IN SUPPORT OF DEFENDANTS-APPELLEES AND IN SUPPORT OF AFFIRMANCE OF THE JUDGMENT BELOW**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>February 5, 2013</u>, at San Francisco, California.

    <u>Angela Galdamez</u>                   <u>/s/ Angela Galdamez</u>
       Declarant                               Signature